UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
CARLOS LEMA, BYRON QUINTUNA, GREGORIO
VASQUEZ, HENRY QUINTUNA, GILBERTO RAMIREZ,
MARCO ORTIZ, and JORGE URGILEZ, individually and on          Civil Action No. 20-cv-02311
behalf of all others similarly situated,

                        Plaintiffs,          **FIFTH AMENDED
COMPLAINT**

            -against-

FITZCON CONSTRUCTION/REN CORP., FITZCON
CONSTRUCTION G.C. INC., FITZCON EXCAVATION
INC, PUB CONSTRUCTION/REN INC., ESCO HIRF CO
INC., RONAN FITZPATRICK, CORNELIUS O'SULLIVAN
a/k/a CONNIE O'SULLIVAN, LIAM O'SULLIVAN, and
JEMZN CONSTRUCTION, INC.,

                        Defendants.
-------------------------------------------------------------------------X

        Plaintiffs Carlos Lema, Byron Quintuna ("Byron"), Gregorio Vasquez, Henry Quintuna

("Henry"), Gilberto Ramirez, Marco Ortiz, and Jorge Urgilez (collectively, "Plaintiffs"),

individually and on behalf of all others similarly situated, by their attorneys, Katz Melinger PLLC,

complaining of the defendants, Fitzcon Construction/Ren Corp. ("Fitzcon Construction/Ren"),

Fitzcon Construction G.C. Inc. ("Fitzcon Construction G.C."), Fitzcon Excavation Inc ("Fitzcon

Excavation"), Pub Construction/Ren Inc. ("Pub Construction"), Esco Hirf Co Inc. ("Esco Hirf"),

Ronan Fitzpatrick, Cornelius O'Sullivan a/k/a Connie O'Sullivan ("Cornelius"), and Liam

O'Sullivan ("Liam") (collectively, "Employer Defendants") and Jemzn Construction, Inc.

("Jemzn," and with Employer Defendants, the "Defendants"), respectfully allege as follows:

## I. Nature of Action, Jurisdiction, and Venue

1.      This is an action seeking equitable and legal relief for Employer Defendants'

violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.*

("FLSA") and the New York Labor Law §§ 190 *et seq.* and 650 *et seq.* ("NYLL").

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that this is an action

arising under the FLSA.

3.      This Court has supplemental jurisdiction over the claims arising under New York

state law pursuant to 28 U.S.C. § 1367, in that the New York state law claims are so closely related

to Plaintiffs' federal claims as to form the same case or controversy under Article III of the United

States Constitution.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391, as a substantial part

of the events and omissions giving rise to the claims occurred in this judicial district, and

Defendants conduct business through their employees, including Plaintiffs, within this judicial

district.

## II. Parties

5.      Plaintiffs are individuals residing in the State of New York.

6.      At all relevant times, Plaintiffs were employed by Employer Defendants.

7.      While employed by Employer Defendants, Plaintiffs were regularly engaged in

interstate commerce and/or in the production of goods for commerce.

8.      Defendants Fitzcon Construction/Ren, Fitzcon Construction G.C., Fitzcon

Excavation, Pub Construction, and Esco Hirf (the "Companies") are domestic corporations.

9.      From at least in or around 2013 until in or around 2014, the principal place of business for Fitzcon Construction/Ren and Fitzcon Construction G.C. was located at 84-52 Grand Avenue, Elmhurst, New York 11373 (the "Original Office").

10.     At all relevant times, Fitzcon Construction/Ren's and Fitzcon Construction G.C.'s principal place of business was located at 110 West 40 Street, Suite #503, New York, New York 10018 (the "New Office").

11.     At all relevant times, Fitzcon Excavation's, Pub Construction's, and Esco Hirf's place of business was located at the Original Office.

12.     The Companies are contractors that provide construction services in the greater New York area.

13.     Defendants Fitzpatrick, Cornelius, and Liam are individuals residing, upon information and belief, in the state of New York.

14.     Jemzn is a domestic corporation formed as the successor entity to the Companies and is located at 6617 53rd Drive, Maspeth, NY 11378.

15.     Upon information and belief, at all relevant times, Fitzpatrick, Cornelius, and Liam, were, and still are, officers, directors, shareholders, and/or persons in control of the Companies and Jemzn who exercise significant control over the Companies' and Jemzn's operations and have the authority to hire, fire, and discipline employees; set employees' work schedules and conditions of employment; determine the rate and method of payment for employees; and maintain employment records.

16.     Upon information and belief, during all relevant times, the Companies and Jemzn had common owners, officers, and directors, and were controlled by Fitzpatrick, Cornelius, and/or Liam.

17.     Upon information and belief, during all relevant times, the Companies operated out of the same locations and at the same addresses: the Old Office and the New Office.

18.     Upon information and belief, during all relevant times, the Companies shared many of the same employees and customers.

19.     Upon information and belief, during all relevant times, the Companies utilized much of the same equipment and inventory.

20.     Upon information and belief, during all relevant times, the Companies provided services to their customers without alerting the customers that they were different entities.

21.     Upon information and belief, at all relevant times, the Companies were operating as one business utilizing many of the same employees, customers, offices, management, and equipment.

22.     Upon information and belief, Fitzcon Construction G.G, Fitzcon Excavation, Pub Construction, and Esco Hirf were operating as mere divisions of Fitzcon Construction/Ren, and not as independent profit centers.

23.     Fitzpatrick directly hired Plaintiffs Lema, Vasquez, and Ramirez to work for the Companies.

24.     Throughout their employments, Plaintiffs Lema and Vasquez reported to Cornelius and/or Liam, who were their direct supervisors at the Companies' worksites.

25.     Throughout Plaintiffs' employment, Fitzpatrick was often present at the worksites, inspecting the premises and speaking with Cornelius and Liam.

26.     Throughout their employments, if Plaintiffs Lema and Vasquez did not receive their paychecks on time or if they felt their pay amount was incorrect, they contacted Cornelius and/or

Liam to inform them of the issue. If Cornelius and/or Liam did not answer, Lema and Vasquez contacted Fitzpatrick, who then remedied the issue.

27.     When Plaintiffs Lema and Vasquez were unsure about the exact location of a worksite, they contacted Cornelius and Liam. If Cornelius and Liam did not answer, Lema and Vasquez contacted Fitzpatrick, who then provided Lema and Vasquez with the worksite's address.

28.     At all relevant times, Plaintiffs were and/or are covered employees within the meaning of the FLSA and the NYLL.

29.     Employer Defendants are covered employers within the meaning of the FLSA and the NYLL and, at all relevant times, employed Plaintiffs.

30.     Upon information and belief, at all relevant times, Employer Defendants' gross revenues were in excess of $500,000.00 per year.

31.     Employer Defendants operate in interstate commerce.

32.     Employer Defendants are subject to suit under the statutes alleged above.

### III. FLSA Collective Action Allegations

33.     The First Cause of Action in this Complaint, which arises out of the FLSA, is brought by Plaintiffs on behalf of themselves and similarly situated persons who were employed since the date three (3) years prior to the filing of this Complaint and who elect to opt-in to this action (the "FLSA Collective Plaintiffs").

34.     The FLSA Collective Plaintiffs consist of no less than eighty (80) similarly situated current and/or former employees of Employer Defendants who worked as laborers and have been victims of Employer Defendants' common policies and practices that have violated their rights under the FLSA by, *inter alia*, willfully denying them overtime wages and other pay.

35.     As part of their regular business practices, Employer Defendants have intentionally, willfully, and repeatedly harmed Plaintiffs and the FLSA Collective Plaintiffs by engaging in a pattern, practice, and/or policy of violating the FLSA. This policy and pattern or practice includes, *inter alia*, failing to pay employees the applicable overtime rate for all time worked in excess of forty (40) hours per week.

36.     Employer Defendants have engaged in their unlawful conduct pursuant to a corporate policy of minimizing labor costs and denying employees compensation.

37.     Employer Defendants' unlawful conduct has been intentional, willful, and in bad faith, and has caused significant damages to Plaintiffs and the FLSA Collective Plaintiffs.

38.     The FLSA Collective Plaintiffs would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Those similarly situated employees are known to Employer Defendants, are readily identifiable, and locatable through Employer Defendants' records. These similarly situated employees should be notified of and allowed to opt-in to this action, pursuant to 29 U.S.C. § 216(b).

### IV. Rule 23 Class Allegations

39.     Plaintiffs bring the Second, Third, Fourth, and Fifth Causes of Action under the NYLL on behalf of themselves and all similarly situated employees who were employed by Employer Defendants since the date six (6) years prior to the filing of the Complaint (the "Class Period") pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23.

40.     All said persons are referred to herein as the "Class." The Class members are readily ascertainable. The number and identity of the Class members are determinable from the records of Employer Defendants. For purposes of notice and other purposes related to this action, their names

and addresses are readily available from Employer Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

41.     The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of such persons is unknown, and the facts from which to calculate that number are presently within the sole control of Employer Defendants, upon information and belief, there are no less than two hundred (200) members in the Class.

42.     Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by each member of the Class in separate actions. All Class members were subject to the same corporate practices of Employer Defendants, as alleged herein, of failing to pay minimum wages; failing to provide wage statements; and failing to provide payroll notices. Employer Defendants' company-wide policies and practices affected all Class members similarly, and Employer Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures.

43.     Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests adverse to the Class. Plaintiffs are represented by attorneys who are experienced and competent in employment and wage and hour litigation and class action litigation and have many times previously represented plaintiffs in wage and hour cases.

44.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy --- particularly in the context of wage and hour litigation where

individual class members lack the financial resources to vigorously prosecute a lawsuit against Defendants.

45.     Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

46.     Because the losses, injuries, and damages suffered by each of the individual Class members are relatively small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Employer Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

47.     Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity which allows for the vindication of their rights while eliminating or reducing these risks.

48.     The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

49.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members, including:

a.      Whether Employer Defendants employed Plaintiffs and the Class within the meaning of the NYLL;

b.      Whether Employer Defendants failed to pay Plaintiffs and the Class overtime compensation for all hours worked in excess of forty (40) hours per workweek;

c.      Whether Employer Defendants unlawfully failed to timely pay Class members their earned wages, in violation of NYLL § 191(1)(a)(i);

d.      Whether Employer Defendants unlawfully failed to provide Class members with payroll notices at the start of their employment, or at any point thereafter, in violation of NYLL § 195(1);

e.      Whether Employer Defendants unlawfully failed to provide Class members, with each wage payment, a statement listing their rates of pay and basis thereof and anything otherwise required by NYLL § 195(3);

f.      Whether Class members are entitled to damages, and if so, the means of measuring such damages;

g.      Whether Employer Defendants are liable for Class members' attorneys' fees and costs; and

h.      Whether Employer Defendants are liable for liquidated damages.

**V. De Facto Merger, Successor Liability and Alter Ego Allegations**

50.     On August 13, 2020, Fitzpatrick, Cornelius, and/or Liam incorporated Jemzn as the successor entity to the Companies.

51.     Jemzn performs the same services as the Companies under the control and direction of Fitzpatrick, Cornelius, and Liam.

52.     Upon information and belief, Jemzn uses the same employees and equipment and has the same ordinary business operations, as the Companies.

53.     Upon information and belief, from August 13, 2020 through March 15, 2021 the Companies began transferring operations to Jemzn, and Jemzn at times made payments on behalf of the Companies.

54.     One specific example of such transfers of operations occurred on January 11, 2021, when Fitzcon Construction/Ren assigned a contract to Jemzn for work being done for OTL Enterprises, LLC. Attached as Exhibit A is a copy of such the assignment.

55.     The assignment was signed by Fitzpatrick on behalf of both Fitzcon Construction/Ren and Jemzn, and noted that "[Fitzon Construsction/Ren] has created a new corporate entity JEMZN CONSTRUCTION INC.,[] whereby [Jemzn] agrees to take on and continue all of its rights and obligations under the Subcontract Agreement."

56.     As of in or around March 15, 2021, the Companies had ceased operations and had transferred all business operations to Jemzn.

57.     For example, on March 19, 2021, soon after the Companies ceased operating, Jemzn made a payment to Skyline Steel, LLC for the benefit of the Companies.

58.      At the time Jemzen was created and at the time the Companies ceased operating under their former names, the herein action and several other lawsuits were pending against the Companies, Fitzpatrick, Cornelius, and/or Liam.

59.     Jemzn was created to continue the Companies' business while avoiding liability for the claims of Plaintiffs herein and other creditors.

60.     Jemzn was created and operates for a wrongful and fraudulent purpose.

## VI. Procedural History

61. On May 22, 2020, Plaintiff Lema filed a Complaint against defendants Fitzcon Excavation, Pub Construction, Esco Hirf, Fitzpatrick, Cornelius, and Liam.

62. On August 11, 2020, Plaintiff Lema filed a First Amended Complaint, adding claims against defendants Fitzcon Construction/Ren and Fitzcon Construction G.C.

63. On December 18, 2020, Plaintiffs Lema, Byron, and Vasquez filed a Second Amended Complaint, adding Byron's and Vasquez's claims against Defendants.

64. On January 8, 2021, Plaintiffs Lema, Byron, and Vasquez filed a Third Amended Complaint, adding Vasquez's retaliation claims against Defendants.

65. On March 31, 2021, Plaintiffs filed a Fourth Amended Complaint to add Henry's, Ramirez's, Ortiz's, and Urgilez's claims against Defendants.

66. Now Plaintiffs file the Fifth Amended Complaint to add the class action allegations and claims, along with claims against Jemzn, Fitzpatrick, Cornelius, and Liam for de facto merger, successor liability, and alter ego liability for committing the fraud of transferring the Companies' assets and operations to Jemzn.

## VII. Factual Allegations

<u>Carlos Lema</u>

67. Plaintiff Carlos Lema worked for Employer Defendants from in or around 2013 until on or around January 28, 2020.

68. From the start of his employment until in or around May 2015, Lema worked solely as a laborer.

69. As a laborer, Lema's primary job duties included carpentry, sheetrock installation, demolition, and other construction-related tasks as required.

70. From in or around June 2015 until in or around December 2016, Lema held the title of worksite manager in addition to his role as a laborer.

71. As a worksite manager, Lema's additional job duties included ordering materials for the construction site, keeping track of the hours worked by other employees, and sending other employees' timesheets to Employer Defendants' main office.

72. Despite being given the title of manager, Lema did not have the authority to hire, fire, promote, or discipline employees; or to set employees' schedules or rates of pay.

73. In or around December 2016, Lema requested a return to working exclusively as a laborer, as he did not receive additional compensation for the work he performed as worksite manager.

74. Thus, from in or around December 2016 until the end of his employment, Lema worked solely as a laborer.

75. From in or around January 2014 until in or around December 2018, Lema regularly worked Mondays through Saturdays, from approximately 7:00 a.m. until 5:30 p.m., with a daily thirty (30) minute lunch break, for a total of approximately sixty (60) hours per week. However, approximately three (3) to four (4) days per week, Lema was required to work until between 8:00 p.m. and 10:00 p.m., bringing his average weekly total to approximately seventy-two and one-fourths (72.25) hours per week.

76. From in or around January 2019 until the end of his employment, Lema regularly worked Mondays through Saturdays, from approximately 7:00 a.m. until 5:30 p.m., with a daily thirty (30) minute lunch break, for a total of approximately sixty (60) hours per week. However, approximately one (1) to two (2) days per week, Lema was required to work

until between 6:00 p.m. and 7:00 p.m., bringing his average weekly total to approximately sixty-one and one-half (61.5) hours per week.

77. Throughout Lema's employment, Employer Defendants compensated Lema at a fixed hourly rate, regardless of the number of hours that he worked each week.

78. From the start of Lema's employment until in or around December 2014, Employer Defendants compensated him at an hourly rate of $15.00 for all hours worked.

79. From in or around January 2015 until in or around December 2016, Employer Defendants compensated Lema at an hourly rate of $20.00 for all hours worked.

80. From in or around January 2017 until in or around December 2018, Employer Defendants compensated Lema at an hourly rate of $25.00 for all hours worked.

81. From in or around January 2019 until the end of Lema's employment, Employer Defendants compensated Lema at an hourly rate of $30.00 for all hours worked.

82. Throughout his employment, Lema was paid by check with no accompanying paystub.

83. From the start of his employment until in or around December 2017, Lema was not required to clock in and out. During this time period, the worksite manager on duty recorded the time that employees began and ended their workday.

84. From in or around January 2018 until the end of Lema's employment, Employer Defendants tracked the hours that Lema worked by requiring him to punch in and out on Employer Defendants' timekeeping system.

<u>Byron Quintuna</u>

85. Plaintiff Byron worked for Employer Defendants from in or around 2017 until in or around June 2019.

86. Throughout his employment, Byron worked as a carpenter.

87. As a carpenter, Byron's primary job duties included building the foundation of stairways, and installing stairways in buildings.

88. Throughout his employment, Byron regularly worked Mondays through Fridays, from approximately 7:00 a.m. until 6:00 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately fifty-one and one-fourths (51.25) hours per week. However, approximately two (2) days per week, Byron was required to work until between approximately 8:00 p.m. and 9:00 p.m., bringing his average weekly total to approximately fifty-six and one-fourths (56.25) hours per week.

89. Throughout Byron's employment, Employer Defendants compensated Byron at a fixed hourly rate, regardless of the number of hours that he worked each week.

90. Throughout Byron's employment, Employer Defendants compensated Byron at an hourly rate of $25.00 for all hours worked.

91. Throughout his employment, Byron was paid by check with no accompanying paystub.

92. Throughout Byron's employment, Employer Defendants tracked the hours that Byron worked by requiring him to punch in and out on Employer Defendants' timekeeping system.

<u>Gregorio Vasquez</u>

93. Plaintiff Vasquez worked for Employer Defendants from in or around 2012 until on or around December 23, 2020.

94. Throughout his employment, Vasquez worked as a general laborer.

95. As a general laborer, Vasquez's primary job duties included operating the rod bending machine, various carpentry tasks, and laying concrete.

96. Throughout his employment, Vasquez regularly worked Mondays through Fridays, from approximately 7:00 a.m. until 6:00 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately fifty-one and one-fourths (51.25) hours per week. However, approximately one (1) to two (2) days per week, Vasquez was required to work until between approximately 8:00 p.m. and 9:00 p.m., bringing his average weekly total to approximately fifty-five (55) hours per week. Furthermore, Vasquez was required to work approximately three (3) Saturdays per month, from approximately 7:00 a.m. until between approximately 4:30 p.m. and 5:00 p.m., with forty-five (45) minutes in daily breaks, bringing his average weekly total to approximately sixty-one and three-fourths (61.75) hours per week.

97. Throughout Vasquez's employment, Employer Defendants compensated Vasquez at a fixed hourly rate, regardless of the number of hours that he worked each week.

98. From at least 2014 until in or around December 2017, Employer Defendants compensated Vasquez at an hourly rate of $20.00 for all hours worked.

99. From in or around January 2018 until in or around January 2020, Employer Defendants compensated Vasquez at an hourly rate of $22.00 for all hours worked.

100.     From in or around February 2020 until in or around December 23, 2020, Employer Defendants compensated Vasquez at an hourly rate of $23.00 for all hours worked.

101.     Throughout his employment, Vasquez was paid by check with no accompanying paystub.

102.     From the start of his employment until in or around December 2017, Vasquez was not required to clock in and out. During this time period, the worksite manager on duty recorded the time that employees began and ended their workday.

103.     From in or around January 2018 until in or around February 2020, Employer
Defendants tracked the hours that Vasquez worked by requiring him to punch in and out
on Employer Defendants' timekeeping system.

104.     From in or around March 2020 until in or around December 23, 2020, Vasquez was
not required to clock in and out. During this time period, the worksite manager on duty
recorded the time that employees begin and end their workday.

105.     On or around December 23, 2020, three (3) days after Vasquez was added as a
Plaintiff to this action, Vasquez was terminated from his employment with Employer
Defendants.

106.     That day, Liam approached Vasquez while he was working on one of Employer
Defendants' worksites and told Vasquez, in sum and substance, "Why did you speak with
the lawyers? Get down from [the scaffolding], and go home. You're fired."

107.     Vasquez subsequently left the worksite and has not been called back to work with
Employer Defendants.

108.     In addition, at the time of his termination, Vasquez was owed his weekly pay for
forty-two (42) hours worked that week, for a total of $966.00 in unpaid wages.

109.     As a result of Employer Defendants' decision to terminate Vasquez's employment,
and Employer Defendants' failure to pay Vasquez for services rendered, Vasquez has and
will continue to suffer damages in the form of lost compensation.

110.     Employer Defendants terminated Vasquez's employment in retaliation for
attempting to assert his legal rights under the FLSA and/or the NYLL by filing a lawsuit
against Employer Defendants for unpaid overtime wages and other pay.

<u>Henry Quintuna</u>

111.     Plaintiff Henry worked for Employer Defendants from in or around January 2017 until in or around June 2019.

112.     Throughout his employment, Henry worked as a laborer.

113.     As a carpenter, Henry's primary job duties included metalworking, building the foundation of stairways, and installing stairways in buildings.

114.     Throughout his employment, Henry regularly worked Mondays through Fridays, from approximately 7:00 a.m. until 6:00 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately fifty-one and one-fourths (51.25) hours worked per week. However, approximately two (2) days per week, Henry was required to work until between approximately 8:00 p.m. and 9:00 p.m., bringing his average weekly total to approximately fifty-six and one-fourths (56.25)  hours worked per week.

115.     In addition, Henry also worked Saturdays during approximately half the weeks throughout his employment, from approximately 8:00 a.m. until between 4:00 p.m. and 5:00 p.m., with a daily forty-five (45) minute break. Thus, on weeks that Henry was required to work Saturdays, Henry worked a total of approximately sixty-four (64) hours.

116.     Throughout Henry's employment, Employer Defendants compensated Henry at a fixed hourly rate, regardless of the number of hours that he worked each week.

117.     From the start of Henry's employment until in or around February 2017, Employer Defendants compensated Henry at an hourly rate of $18.00 for all hours worked.

118.     From in or around March 2017 until in or around August 2017, Employer Defendants compensated Henry at an hourly rate of $20.00 for all hours worked.

119.     From in or around September 2017 until the end of Henry's employment, Employer Defendants compensated Henry at an hourly rate of $22.00 for all hours worked.

120.     Throughout his employment, Henry was paid by check with no accompanying paystub.

121.     Throughout Henry's employment, Employer Defendants tracked the hours that Henry worked by requiring him to punch in and out on Employer Defendants' timekeeping system.

<u>Gilberto Ramirez</u>

122.     Plaintiff Ramirez worked for Employer Defendants periodically from in or around September 2015 until in or around March 2020.

123.     Throughout this time period, Ramirez worked for Employer Defendants for a total of approximately eight (8) months of each year, whenever he was called to work on certain projects.

124.     Throughout his employment, Ramirez worked as a laborer and a fireguard.

125.     As a laborer, Ramirez's primary job duties included transporting materials, demolition, and other construction-related tasks as required.

126.     As a fireguard, Ramirez's primary job duties included carrying a fire extinguisher, accompanying employees performing welding or grinding work on the job site, and being prepared to use the fire extinguisher if necessary.

127.     Throughout his employment, Ramirez regularly worked Mondays through Saturdays, from approximately between 7:00 a.m. and 7:30 a.m. until 3:30 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately forty-five (45) hours per week. However, approximately two (2) days per week, Ramirez was required to work until

between approximately 7:30 p.m. and 8:30 p.m., bringing his average weekly total to approximately fifty-four (54) hours worked per week.

128.     Throughout Ramirez's employment, Employer Defendants compensated Ramirez at a fixed hourly rate, regardless of the number of hours that he worked each week.

129.     At the start of Ramirez's employment, Employer Defendants compensated Ramirez at an hourly rate of $15.00 for all hours worked.

130.     Approximately every one and one-half (1.5) years, Employer Defendants increased Ramirez's hourly rate by $1.00, until it reached $18.00 for the final approximately four (4) months of his employment.

131.     Throughout his employment, Ramirez was paid by check with no accompanying paystub.

132.     From the start of his employment until in or around 2018, Ramirez was not required to clock in and out. During this time period, the worksite manager on duty recorded the time that employees began and ended their workday.

133.     From in or around 2019 until the end of Ramirez's employment, Employer Defendants tracked the hours that Ramirez worked by requiring him to punch in and out on Employer Defendants' timekeeping system.

<u>Marco Ortiz</u>

134.     Plaintiff Ortiz worked for Employer Defendants from in or around March 2016 until in or around January 2018.

135.     Throughout his employment, Ortiz worked as a carpenter.

136.     As a carpenter, Ortiz's primary job duties included building the foundation of stairways, and installing stairways in buildings.

137.    Throughout his employment, Ortiz regularly worked six (6) days per week as follows: Mondays through Fridays, from approximately 7:00 a.m. until 6:30 p.m., with forty-five (45) minutes in daily breaks; and Saturdays from approximately 7:00 a.m. until 3:30 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately sixty-one and one-half (61.5) hours worked per week.

138.    However, approximately two (2) weekdays per week, Ortiz was required to work until approximately 10:00 p.m., bringing his average weekly total to approximately sixty-eight and one-half (68.5) hours per week.

139.    Throughout Ortiz's employment, Employer Defendants compensated Ortiz at a fixed hourly rate, regardless of the number of hours that he worked each week.

140.    From the start of Ortiz's employment until in or around July 2016, Employer Defendants compensated Ortiz at an hourly rate of $28.00 for all hours worked.

141.    From in or around August 2016 until the end of Ortiz's employment, Employer Defendants compensated Ortiz at an hourly rate of $30.00 for all hours worked.

142.    Throughout his employment, Ortiz was paid by check with no accompanying paystub.

143.    Throughout Ortiz's employment, Ortiz was not required to clock in and out. Rather, throughout Ortiz's employment the worksite manager on duty recorded the time that employees began and ended their workday.

<u>Jorge Urgilez</u>

144.    Plaintiff Urgilez worked for Employer Defendants from in or around 2017 until in or around December 2019.

145.    Throughout his employment, Urgilez worked as a carpenter.

146.     As a carpenter, Urgilez's primary job duties included building the foundation of stairways, and installing stairways in buildings.

147.     Throughout his employment, Urgilez regularly worked Mondays through Fridays, from approximately 7:00 a.m. until 6:00 p.m., with forty-five (45) minutes in daily breaks, for a total of approximately fifty-one and one-fourths (51.25) hours per week. However, approximately two (2) days per week, Urgilez was required to work until between approximately 8:00 p.m. and 9:00 p.m., bringing his average weekly total to approximately fifty-six and one-fourths (56.25) hours worked per week.

148.     Throughout Urgilez's employment, Employer Defendants compensated Urgilez at a fixed hourly rate, regardless of the number of hours that he worked each week.

149.     From the start of Urgilez's employment until in or around August 2019, Employer Defendants compensated Urgilez at an hourly rate of $18.00 for all hours worked.

150.     From in or around September 2019 until the end of Urgilez's employment, Employer Defendants compensated Urgilez at an hourly rate of $27.00 for all hours worked.

151.     Throughout his employment, Urgilez was paid by check with no accompanying paystub.

152.     Throughout Urgilez's employment, Urgilez was not required to clock in and out. Rather, throughout Urgilez's employment the worksite manager on duty recorded the time that employees began and ended their workday.

<u>All Named Plaintiffs</u>

153.     Throughout their employment, Plaintiffs were non-exempt employees pursuant to the FLSA and the NYLL, and were entitled to overtime compensation.

21

154.    However, despite routinely working more than forty (40) hours per week, Plaintiffs were not paid overtime compensation of one and one-half (1.5) times their regular hourly rate of pay for all hours they worked over forty (40) per week.

155.    Employer Defendants also failed to furnish to Plaintiffs, at the time they were hired or at any time thereafter, a notice containing their rates of pay, the designated payday, or other information required by NYLL § 195(1).

156.    Furthermore, Plaintiffs did not receive, with each wage payment, a statement listing their regular and overtime rates of pay, the number of regular and overtime hours worked, gross wages, deductions, and anything otherwise required by NYLL § 195(3).

157.    Employer Defendants violated federal and state law by willfully failing to pay Plaintiffs and similarly situated employees overtime compensation, and by failing to provide Plaintiffs with the required payroll notices and wage statements.

### AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFFS, INDIVIDUALLY, AND THE FLSA COLLECTIVE PLAINTIFFS
(Overtime Violations Under the FLSA)

158.    Plaintiffs, on behalf of themselves and the FLSA Collective Plaintiffs, repeat and reallege all prior allegations set forth above.

159.    Pursuant to the applicable provisions of the FLSA, Plaintiffs and the FLSA Collective Plaintiffs were entitled to overtime compensation of one and one-half (1.5) times their regular hourly rates of pay or the applicable minimum wage, whichever is greater, for all hours worked in excess of forty (40) hours per week.

160.    Plaintiffs and the FLSA Collective Plaintiffs regularly worked in excess of forty (40) hours per week during their employment with Employer Defendants.

161.    Throughout the relevant time period, Employer Defendants knowingly failed to pay Plaintiffs and the FLSA Collective Plaintiffs overtime wages of one and one-half (1.5)

times their regular hourly rates of pay for each hour worked in excess of forty (40) hours in a week.

162.     As a result of Employer Defendants' violations of the law and failure to pay Plaintiffs and the FLSA Collective Plaintiffs the required overtime wages, Plaintiffs and the FLSA Collective Plaintiffs have been damaged and are entitled to recover from Employer Defendants all overtime wages due, along with all reasonable attorneys' fees, interest, and costs.

163.     As Employer Defendants did not have a good faith basis to believe that their failure to pay overtime wages was in compliance with the law, Plaintiffs and the FLSA Collective Plaintiffs are entitled to liquidated damages.

164.     Judgment should be entered in favor of Plaintiffs and the FLSA Collective Plaintiffs and against Employer Defendants on the First Cause of Action in the amount of their respective unpaid overtime wages, liquidated damages, attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF PLAINTIFFS, INDIVIDUALLY AND THE CLASS PLAINTIFFS
(Overtime Violations Under the NYLL)

165.     Plaintiffs, on behalf of themselves and the Class Plaintiffs, repeat and reallege all prior allegations set forth above.

166.     Pursuant to the applicable provisions of the NYLL, Plaintiffs and the Class Plaintiffs were entitled to overtime compensation of one and one-half (1.5) times their regular hourly rate of pay or the applicable minimum wage, whichever is greater, for all hours worked in excess of forty (40) hours per week.

167.     Plaintiffs and the Class Plaintiffs regularly worked in excess of forty (40) hours per week during their employment with Defendants.

168.	Throughout the relevant time period, Employer Defendants knowingly failed to pay Plaintiffs and the Class Plaintiffs overtime wages of one and one-half (1.5) times their regular hourly rate of pay for each hour worked in excess of forty (40) hours in a week.

169.	As a result of Employer Defendants' violations of the law and failure to pay Plaintiffs and the Class Plaintiffs the required overtime wages, Plaintiffs and the Class Plaintiffs have been damaged and are entitled to recover from Employer Defendants all overtime wages due, along with all reasonable attorneys' fees, interest, and costs.

170.	As Employer Defendants did not have a good faith basis to believe that their failure to pay overtime wages was in compliance with the law, Plaintiffs and the Class Plaintiffs are entitled to liquidated damages.

171.	Judgment should be entered in favor of Plaintiffs and the Class Plaintiffs and against Employer Defendants on the Second Cause of Action in the amount of their unpaid overtime wages, liquidated damages, attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION ON BEHALF OF PLAINTIFFS, INDIVIDUALLY, AND THE CLASS PLAINTIFFS**
(Failure to Timely Pay Wages under the NYLL)

172.	Plaintiffs, on behalf of themselves and the Class Plaintiffs, repeat and reallege all prior allegations set forth above.

173.	Pursuant to the provisions of NYLL § 191(1)(a)(i), Plaintiffs and the Class Plaintiffs were entitled to be paid their earned wages weekly and not later than seven (7) calendar days after the end of the week in which the wages were earned.

174.     During the relevant period, Employer Defendants routinely failed to pay Plaintiffs and the Class Plaintiffs all of their earned wages in accordance with the agreed-upon terms of employment.

175.     During the relevant period, Employer Defendants failed to timely pay Plaintiffs and the Class Plaintiffs all of their earned wages on a weekly basis and not later than seven (7) calendar days after the end of the week in which the wages were earned.

176.     Throughout the relevant period, Employer Defendants failed to timely pay Plaintiffs and the Class Plaintiffs all overtime wages earned by Plaintiffs, in violation of NYLL § 191(1)(a)(i).

177.     As a result of Employer Defendants' violations of the law and failure to pay Plaintiffs and the Class Plaintiffs in accordance with NYLL § 191(1)(a)(i), Plaintiffs have been damaged and are entitled to recover from Employer Defendants all wages due, along with all reasonable attorneys' fees, interest, and costs.

178.     As Employer Defendants did not have a good faith basis to believe that their failure to pay wages was in compliance with the law, Plaintiffs and the Class Plaintiffs are entitled to liquidated damages.

179.     Judgment should be entered in favor of Plaintiffs and the Class Plaintiffs and against Employer Defendants on the Third Cause of Action for all wages due, liquidated damages, attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION ON BEHALF OF PLAINTIFFS,**
**INDIVIDUALLY, AND THE CLASS PLAINTIFFS**
(Failure to Provide Payroll Notices Under the NYLL)

180.     Plaintiffs, on behalf of themselves and the Class Plaintiffs, repeat and reallege all

prior allegations set forth above.

181.     Employer Defendants failed to furnish to Plaintiffs and the Class Plaintiffs, at their

time of hire or at any time thereafter, notices containing their rate or rates of pay and basis

thereof; allowances, if any, claimed as part of the minimum wage; their regular pay day

designated by the employer; and other information required by NYLL § 195(1).

182.     As Employer Defendants failed to provide Plaintiffs and the Class Plaintiffs with

payroll notices as required by NYLL § 195(1), Plaintiffs are entitled to liquidated damages

in the amount of $50.00 per day in which the violation occurred, up to a maximum of

$5,000.00 each, along with all reasonable attorneys' fees and costs.

183.     Judgment should be entered in favor of Plaintiffs and the Class Plaintiffs and

against Employer Defendants on the Fourth Cause of Action in the amount of $5,000.00

each, along with attorneys' fees, costs, interest, and such other legal and equitable relief as

this Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION ON BEHALF OF PLAINTIFFS,**
**INDIVIDUALLY, AND THE CLASS PLAINTIFFS**
(Failure to Provide Wage Statements Under the NYLL)

184.     Plaintiffs, on behalf of themselves and the Class Plaintiffs, repeat and reallege all

prior allegations set forth above.

185.     Throughout the relevant time period, Employer Defendants failed to furnish to

Plaintiffs and the Class Plaintiffs, with each wage payment, a statement listing: their

regular and overtime rates of pay and basis thereof; the number of regular and overtime

hours they worked; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages; in violation of NYLL § 195(3).

186.    As Employer Defendants failed to provide Plaintiffs and the Class Plaintiffs with wage statements as required by NYLL § 195(3), Plaintiffs are entitled to liquidated damages in the amount of $250.00 per day for every day in which the violation occurred, up to a maximum of $5,000.00 each, along with all reasonable attorneys' fees and costs.

187.    Judgment should be entered in favor of Plaintiffs and the Class Plaintiffs and against Employer Defendants on the Fifth Cause of Action in the amount of $5,000.00 each, along with attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF VASQUEZ
(Retaliation under the FLSA)

188.    Plaintiffs repeat and reallege all prior allegations.

189.    On or around December 18, 2020 Plaintiff Vasquez asserted claims of unpaid overtime wages under the FLSA against Employer Defendants by joining Plaintiff Lema's action against Employer Defendants.

190.    Defendants terminated Vasquez's employment on or around December 23, 2020, three (3) days after Vasquez joined Plaintiffs' action against Employer Defendants.

191.    Employer Defendants terminated Vasquez's employment in retaliation for Vasquez's attempt to assert his legal rights under the FLSA.

192.    Upon information and belief, Vasquez was the only employee terminated on or around December 23, 2020.

193.    Employer Defendants did not have any legitimate, non-retaliatory reason for terminating Vasquez's employment.

194.    Employer Defendants' termination of Vasquez's employment constitutes unlawful retaliation in violation of the FLSA, 29 U.S.C. § 215(a)(3).

195.    As a result of Employer Defendants' violations of the law, Vasquez has been damaged and is entitled to recover from Employer Defendants emotional, and punitive damages, if applicable, along with lost wages, front pay, liquidated damages, reasonable attorneys' fees, and costs.

196.    Judgement should be entered in favor of Vasquez and against Employer Defendants on the Sixth Cause of Action for emotional, and punitive damages, if applicable, lost wages, front pay, liquidated damages, reasonable attorneys' fees, costs, interest, and such other legal and equitable relief as this Court deems just and proper.

### AS AND FOR AN SEVENTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF VASQUEZ
(Retaliation Under the NYLL)

197.    Plaintiffs repeat and reallege all prior allegations.

198.    Employer Defendants terminated Plaintiff Vasquez's employment three (3) days after, and in retaliation for, Vasquez's attempt to assert his legal rights under the NYLL.

199.    Employer Defendants' termination of Vasquez's employment constitutes unlawful retaliation in violation of NYLL § 215.

200.    As a result of Employer Defendants' violations of the law, Vasquez has been damaged and is entitled to recover from Defendants emotional, and punitive damages, if applicable, along with lost wages, front pay, liquidated damages, reasonable attorneys' fees, and costs.

201.     Judgement should be entered in favor of Vasquez and against Employer Defendants

on the Seventh Cause of Action for emotional, and punitive damages, if applicable, lost

wages, front pay, liquidated damages, reasonable attorneys' fees, costs, interest, and such

other legal and equitable relief as this Court deems just and proper.

**AS AND FOR A EIGHTH CAUSE OF ACTION AGAINST
FITZCON CONSTRUCTION/REN, FITZCON CONSTRUCTION G.C.,
FITZCON EXCAVATION, PUB CONSTRUCTION, ESCO HIRF, AND JEMZN**
(Corporate Combine)

202.     Plaintiffs repeat and reallege all prior allegations as set forth above.

203.     Upon information and belief, Fitzcon Construction/Ren, Fitzcon Contruction G.C.,

Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn operate and/or operated as a

single business operation.

204.     Upon information and belief, Fitzcon Construction/Ren's, Fitzcon Contruction

G.C.'s, Fitzcon Excavation's, Pub Construction's, Esco Hirf's and Jemzn's records are

and/or were maintained by the same persons and entities.

205.     Upon information and belief, Fitzcon Construction/Ren, Fitzcon Contruction G.C.,

Fitzcon Excavation, Pub Construction, Esco Hirf and Jemzn employ and/or employed

many of the same employees.

206.     Upon information and belief, Fitzcon Construction/Ren, Fitzcon Contruction G.C.,

Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn are and/or were each merely

fragments of a larger business.

207.     Upon information and belief, Fitzcon Construction/Ren, Fitzcon Contruction G.C.,

Fitzcon Excavation, Pub Construction, Esco Hirf and Jemzn are and/or were not

maintained as separate corporate entities.

208.      Judgment should be entered on the Eighth Cause of Action in favor of Plaintiffs

and against Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub

Construction, Esco Hirf, and Jemzn determining they were merely part of a corporate

combine and declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon

Excavation, Pub Construction, Esco Hirf, and Jemzn liable for each other's debts and for

all amounts due in the First through Seventh Causes of Action herein, and such other legal

and equitable relief as this Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION AGAINST FITZCON
CONSTRUCTION/REN, FITZCON CONSTRUCTION G.C.,  FITZCON
EXCAVATION, PUB CONSTRUCTION, ESCO HIRF, AND JEMZN**
(De Facto Merger)

209.      Plaintiffs repeat and reallege all prior allegations as set forth above.

210.      Upon information and belief, there was continuity of ownership between the

Companies and Jemzn at the time the Companies ceased their operations and Jemzn began

its operations.

211.      Upon information and belief, at the time that the Companies ceased their operations

and Jemzn began its operations, Jemzn assumed the liabilities ordinarily necessary for the

uninterrupted continuation of the Companies' business.

212.      Upon information and belief, at the time that the Companies ceased their operations

and Jemzn began its operations, there was continuity of management, personnel, physical

location, assets, and the Companies' business in general by Jemzn.

213.      Based on the foregoing, Jemzn actually or impliedly assumed the Companies'

liabilities.

214.     Judgment should be entered on the Ninth Cause of Action in favor of Plaintiffs and

against Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub

Construction, Esco Hirf, and Jemzn, determining that a de facto merger occurred and

declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub

Construction, Esco Hirf, and Jemzn liable for each other's debts and for all amounts due in

the First through Seventh Causes of Action herein, and such other legal and equitable relief

as this Court deems just and proper.

### AS AND FOR A TENTH CAUSE OF ACTION AGAINST FITZCON CONSTRUCTION/REN, FITZCON CONSTRUCTION G.C.,  FITZCON EXCAVATION, PUB CONSTRUCTION, ESCO HIRF, AND JEMZN
(Mere Continuation)

215.     Plaintiffs repeat and reallege all prior allegations as set forth above.

216.     In or around the beginning of 2021, when the Companies ceased operating, Jemzn

merely continued the Companies' business with the same owners, officers, and persons in

control.

217.     The only change between the Companies and Jemzn was the name of the entity

conducting the business.

218.     Judgment should be entered on the Tenth Cause of Action in favor of Plaintiffs and

against Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub

Construction, Esco Hirf, and Jemzn, determining that Jemzn was a mere continuation of

the Companies and declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon

Excavation, Pub Construction, Esco Hirf, and Jemzn liable for each other's debts and for

all amounts due in the First through Seventh Causes of Action herein, and such other legal

and equitable relief as this Court deems just and proper.

### AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
(Alter Ego)

219.    Plaintiffs repeat and reallege all prior allegations as set forth above.

220.    Upon information and belief, Fitzpatrick, Cornelius, and Liam were owners, officers, managers and/or persons in control of the Companies and Jemzn, and exercised complete dominion and control over those businesses.

221.    Fitzpatrick, Cornelius, and Liam used said domination and control to commit fraud or wrong against Plaintiffs, causing injury to Plaintiffs in that the Companies' entire business was transferred to Jemzn while Jemzn utilized all of the Companies' assets, employees, operations, and goodwill, and seamlessly continued the Companies' operations.

222.    Fitzpatrick, Cornelius, and Liam transferred the Companies' entire business to Jemzn during this lawsuit, leaving the Companies as empty shells.

223.    The corporate veil should be pierced to impose common liability on all Defendants.

224.    Judgment should be entered on the Eleventh Cause of Action in favor of Plaintiffs and against Defendants declaring all Defendants liable for each other's debts and for all amounts due in the First through Seventh Causes of Action herein, and such other legal and equitable relief as this Court deems just and proper.


WHEREFORE Plaintiffs, on behalf of themselves and the FLSA Collective Plaintiffs and the Class Plaintiffs, pray for relief as follows:

a)  on the First Cause of Action for all overtime wages due to Plaintiffs and the FLSA Collective Plaintiffs by Employer Defendants, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court;

b)  on the Second Cause of Action for all overtime wages due to Plaintiffs and Class Plaintiffs by Employer Defendants, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court;

c)  on the Third Cause of Action for all wages due to Plaintiffs and Class Plaintiffs by Employer Defendants, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court;

d)  on the Fourth Cause of Action on behalf of Plaintiffs and Class Plaintiffs for liquidated damages in the amount of $50.00 per day in which the violation occurred, up to a maximum of $5,000.00 each, along with reasonable attorneys' fees in an amount to be determined by this Court against Employer Defendants;

e)  on the Fifth Cause of Action on behalf of Plaintiffs and Class Plaintiffs for liquidated damages in the amount of $250.00 per day for every day in which the violation occurred, up to a maximum of $5,000.00 each, along with reasonable attorneys' fees in an amount to be determined by this Court against Employer Defendants;

f)  on the Sixth Cause of Action on behalf of Plaintiff Vasquez for all emotional, and punitive damages, if applicable, along with all lost wages and front pay, liquidated damages, and reasonable attorneys' fees in an amount to be determined by this Court against Employer Defendants;

g)  on the Seventh Cause of Action on behalf of Plaintiff Vasquez for all emotional, and punitive damages, if applicable, along with all lost wages, front pay, liquidated

damages, and reasonable attorneys' fees in an amount to be determined by this Court against Employer Defendants;

h)   on the Eighth Cause of Action in favor of Plaintiffs and against Fitzcon Construction/Ren, Fitzcon Construction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn, determining they were merely part of a corporate combine and declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn liable for each other's debts and for all amounts due in the First through Seventh Causes of Action herein;

i)   on the Ninth Cause of Action in favor of Plaintiffs and against Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn, determining that  a de facto merger occurred and declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn liable for each other's debts and for all amounts due in the First through Seventh Causes of Action herein;

j)   on the Tenth Cause of Action in favor of Plaintiffs and against Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf,and  Jemzn, determining that Jemzn was a mere continuation of the Companies and declaring Fitzcon Construction/Ren, Fitzcon Contruction G.C., Fitzcon Excavation, Pub Construction, Esco Hirf, and Jemzn liable for each other's debts and for all amounts due in the First through Seventh Causes of Action herein;

k)   on the Eleventh Cause of Action in favor of Plaintiffs and against Defendants declaring all Defendants liable for each other's debts and for all amounts due in the First through Seventh Causes of Action herein;

l)   Interest;

m)  Costs and disbursements; and

n)   Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        May 5, 2022

                                        */s/ Nicole Grunfeld*
                                        Nicole Grunfeld
                                        Katz Melinger PLLC
                                        370 Lexington Avenue, Suite 1512
                                        New York, New York 10017
                                        Telephone: (212) 460-0047
                                        Facsimile: (212) 428-6811
                                        ndgrunfeld@katzmelinger.com
                                        *Attorneys for Plaintiffs*

35